Judge Cake:
In this case, Freeland having an execution against Wright, levied it on two slaves, as the property of his debtor; and the plaintiff injoined the sale, on the ground that he was a fair purchaser of the slaves, from Wright, at a public sale, made prior to the judgment; and, therefore, not affected by it. In Wilson v. Butler, 3 Murf. 559, this Court decided, that the legal remedy of a party', whose property was wrongfully seized under an execution against another, was not in exclusion of a proceeding in equity, having for its object the retention of the property in specie; and this equitable jurisdiction was placed on the same ground with the specific execution of contracts.
Every case of this class, presents to the sound discretion of the Court, this question; whether, under all the circumstances, it is belter for the advancement of justice, that they should interpose, or leave the party to his legal remedy. In Wilson v. Butler, the application was under a deed of trust, (the creature of equity;) the property taken by the execution consisted of family slaves, placed in the care of the trustee, for the support of a feme covert, and her family; and the Court state, as one of the grounds of interference, that damages would be an inadequate compensation. The case made by the bill before us, is of a different complexion. No sacrifice of feeling, no considerations of humanity, are involved. These were not family slaves, but strangers to the plaintiff,—brought from a distance, and casually purchased at a public sale; no statement that they were peculiarly valuable for their character, qualities, or skill in any trade or handicraft; or that the plaintiff bought them cheap, and would be injured by the loss of his bargain. He has paid no money, and never can he forced to pay a cent, if he does not hold the slaves. The money which he intended to vest in this way, he has had the use of; and could now vest it much more advantageously, in. the same kind of property. All his legal *174 remedies are .before him, and no suggestion of insolvency in the defendant. By refusing the aid of equity, then, the plaintiff can suffer no material injury, while, by its interference, Wright is enabled to consummate his unhallowed purpose (so fully in proof;) and the claim of a fair creditor, probably defeated. On this view of the case, I should be inclined to affirm the decree, even upon the hypothesis that the plaintiff was a bona fide purchaser. But, this record presents strong grounds for implicating him in the fraud, which it is so clear that Wright and Fariss were attempting to perpetrate. He states, in his bill, that he bought the slaves of Wright. Yet, it is in evidence, that they were advertised for sale by Fariss. The crier says he thought they belonged to Fariss. The plaintiff executed his bonds for the purchase money, to Fariss. He told W, I. Freeland, after the levy of the execution, that he had bought of Fariss; and he received bills of sale, both from Fariss and Wright; and each bill of sale contains a general warranty, and states, that the plaintiff had given his bonds to the maker, for the purchase money. These bills are said, by one witness, to have been executed since the sale. Is it possible to account for this conduct in the plaintiff, unless upon the supposition, that he knew of the trafficking and combination between. Wright and Fariss, to withdraw these slaves from the reach of the creditor, and of the bill of sale from Wright to Fariss for them ? And, if he knew of this, the conclusion is strong, that he purchased to aid their views: that the sale was colourable merely; and that his present suit is for their benefit, not his own. I am for affirming the decree.
Judge Green:
In general, a Court of Equity has no jurisdiction to give relief, where the party has a remedy at law, unless the legal remedy be inadequate to the doing of complete justice *175 between the parties; but in such cases, Chancery has jurisdiction. It is upon this principle only, that Courts of Equity decree the specific execution of contracts, in cases where the legal remedy of the party is inadequate. Thus, a contract for land, may be specifically executed in Chancery, because each piece of land has a value, arising from its local situation, and circumstances peculiar to itself; especially in relation to particular persons. Damages can only be given, at law, to the amount of the market value of the property, or the value which any person wishing to purchase land, without regard to the peculiar advantages of the particular tract, in relation to his own particular views, would put upon it. And, therefore, such damages, in general, would not he an adequate compensation to the disappointed party. In like manner, damages given to the vendor of land for the failure to perform the contract, would, in general, be an inadequate compensation to him. Bui Equity will not, in general, decree the specific execution of a contract relating to personal chattels, because damages are, in such cases, a perfect compensation for the injury arising from the failure to perform the contract; since money would, in general, purchase other articles of personal property, of the same qualities and value. In such cases, the assistance of a Court of Equity is superfluous. Yet, in England, a Court of Equity will interfere to give to the owner articles of personal property, which, although they may be of little value in the market, are precious to the owner, and cannot be ro-placsd by any other thing of the like kind; as an ancient horn which had been in the family for ages; old family plate, &.c.
Upon the same principle as a Court of Equity will aid the person entitled, to get the possession of specific property, the Court will (as was said by Judge Roans, for t he whole Court, in Wilson and Trent v. Butler and al. 3 Munf. 564,) interfere by injunction, to preserve specific property in possession of the owner. But to justify such interposition, the property must have a peculiar value, or *176 properties which attach the owner to it, and such as cannot be re-placed by the purchaser of similar property, in the market; so that damages will not be an adequate compensation ^01’ t^e ^oss of the property. There is no remedy at law,' which insures the recovery of specific property. The judgment in detinue can only be enforced by distrifzgas. Slaves are a peculiar species of property. They have moral qualities, and confidence and attachment grow up between master and slave; the value of which cannot be estimated by a jury. These principles are practised upon in the English Court of Chancery, in relation to personal property, not properly the subject of compensation in damages. Lady Arundell v. Phipps, 10 Ves. 139; Milbourn v. Thornton, 10 Ves. 163. I should incline to think that slaves ought, prima facia, to be considered as of peculiar value to their owners, and not properly a subject for adequate compensation in damages, as land is considered to be to a purchaser; but that this presumption may be repelled, as in the case of a person purchasing slaves for the avowed purpose of selling them again. In this case, the appellant does not appear ever to have seen the slaves before he purchased them. They resided, until a short time, in Buckingham; he, probably, in Henrico. He never had possession of them, and never paid any part of the purchase money. And, upon this ground, -I should incline to think, that the injunction was properly dissolved.
It is not necessary, however, to decide the case upon this ground, since I am perfectly satisfied, that Wright and Fariss, were guilty of a gross fraud in the disposition of this property; the sole object of which was to frustrate the demand of the appellee, and to preserve the property for Wright; and that the appellant was a participator in the fraud. It is not necessary to notice the multiplied proofs of the fraud of Wright and Fariss. Every thing done by them indicated to Allen, that the sale was not made with the usual motives, which induce men to part • with their property; and every thing done by Allen, *177 shews that he understood the real motives, upon which the others acted; and that he acted in collusion with them. The negroes were professedly sold by Fariss as the property of Wright, who was present; yet the bonds (if any were executed) were given to Fariss; and Mien took a bill of sale from him with general warranty. This was in pursuance of the original scheme of fraud, in conveying the negroes to Fariss. But, doubting the validity of this title, a deed was also executed to Mien by Wright, probably at an after period. The sale was made whilst the negroes were hired out, without any agreement on the part of the person hiring them to give them up. This un usual and almost unexampled course was calculated to affect deeply the price of the negroes. And whjr was the sale made under these circumstances? A person hard pressed for money might indeed resort to such a desperate expedient to raise it. But Wright did not want money; for he sold on a credit of one and two years; or rather he did, as ajipears, really want money, but did not choose to part with the negroes, or leave them liable to the payment of his debts. The negroes were sold at a country tavern not very far from Richmond, where they certainly would not have been carried and sold, if Wright had really intended to sell them in earnest, for the best price he could get. Wright was selling all his property, and did not require any security for so considerable a sum, and all that he was worth. It does not even appear, whether the purchaser was to have the hire of the negroes for the year 1822, or not. It is probable, that not a word was said at the sale; upon that subject; and that in the understanding of all parties concerned, it was wholly immaterial, as Wright was not parting with the negroes, or their hires. This pretended purchaser lias not paid a farthing, nor taken possession of flic property. All these circumstances are so inconsistent with the usual course of bona fide transactions, as conclusively to condemn this transaction as fraudulent, on the part of all persons concerned. Mien is not seeking to *178 avoid a loss; he cannnot lose any thing. The circumstances prove, that he had no particular reason for wishing to own these slaves; and he is now struggling, without any personal interest in the event, to consummate Wright's fraudulent contrivance.
The order dissolving the injunction should be affirmed.
Judge Coalter:
On the merits, I am of opinion, under all the circumstances, that the appellant had good reason to believe that the sale to him was fraudulent; and he is, at the least, lending himself, without any apparent interest, to consummate a fraud on the appellee. But, if that was not the case, still, according to his bill, he claims under Wright, the fraudulent debtor, who had before conveyed the slaves for the purpose, between him and his grantee, to defraud his creditors, which, though void as to them, was good as to him; so that he had probably no title to pass, of which the appellant could avail himself. Again; if there were nothing in all this, yet, under the circumstances of this case, the most I would do would be, to perpetuate the injunction, on condition that the appellant would pay the money into Court within a reasonable time, otherwise to dissolve it.
The President:
The principle on which the Court of Chancery exercises its restraining power in this country, in a case in which the peculiar value of the property cannot be compensated for at law, is the same on which the English Courts proceed. But, as regards slave property, there is a wider range for its application. Slaves are not only property, but they are rational beings, and entitled to the humanity of the Court, when it can be exercised without invading the right of property; and as regards the owner, the.r value is *179 much enhanced by the mutual attachment of master and slave; a value which cannot enter into the calculation of damages by a jury. In all such cases, therefore, this Court has exercised a restraining power, except a case in which, whatever may be the decision of it, the property is to' be sold, and the only controversy is as to the proceeds of the sale. In this case, though Allen purchased the property at a public sale, and was but a short time in possession of it, in his opinion, he may have gotten a bargain; he may have set a higher value on the moral qualities of the slave (of vyhieh he may have been informed by others) than a jury would have compensated him for. I therefore think that the injunction was properly awarded.
On the merits, I refused the appeal in the country, and concur in the opinion, that the decree ought to be affirmed.